[Cite as *State v. Orta*, 2020-Ohio-4514.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO. 13-20-05

    v.

ALEXZANDRIA H. ORTA,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Tiffin-Fostoria Municipal Court
Trial Court No. CRB 2000228

Judgment Reversed and Cause Remanded

Date of Decision: September 21, 2020

APPEARANCES:

    *Dean Henry* for Appellant

    *Derek W. Devine* for Appellee

Case No. 13-20-05

**SHAW, P.J.**

{¶1} Defendant-appellant, Alexzandria Orta ("Orta"), appeals the March 11, 2020 judgment of the Tiffin-Fostoria Municipal Court finding her in direct contempt of court for refusing to submit to a urine test and sentencing her to ten days in jail. On appeal, Orta claims that the trial court abused its discretion and denied her due process of law when it found her in contempt of court.

*Relevant Facts*

{¶2} On March 11, 2020, Orta was present in the courtroom as a spectator, sitting in the gallery and observing the proceedings of the Tiffin-Fostoria Municipal Court. The record establishes that Orta had no business other than to observe the proceedings as a member of the general public in the open courtroom.[1]

{¶3} During proceedings involving at least two criminal defendants and without any apparent action by Orta bringing attention to herself, the record reflects that the trial judge mentioned Orta by name several times. Specifically, while addressing the case of Paul Compliment with the prosecutor, the trial judge appeared to notice Orta sitting in the back of the courtroom.

> **The Court: Let's do a drug test.**
>
> **Prosecutor: Let's start there with Paul (Compliment).**
>
> **The Court: Going to be lots of drug tests today. *Is that Trevor's girlfriend (Orta) back there?***

---

[1] The record further suggests that Orta may have been in the courtroom to observe the arraignment proceeding of a personal acquaintance.

-2-

**Voice 1: I'm not sure, Your Honor.**

**The Court: I don't know. I thought maybe it was.**

(Tr. at 2-3)(emphasis added).

{¶4} After taking a short recess, the court returned on the record to conclude Compliment's case upon receiving the results of Compliment's drug test. Again unprompted by any apparent action on Orta's part, the trial judge attempted to engage with Orta, while Orta remained seated in the gallery of the courtroom.

**Prosecutor: Mr. Compliment. He is clean.**

**The Court: Excellent. Very good. Mr. Compliment, at least we don't know that dope is part of your issue. *Right, Ms. Orta*? It's always a bad thing—**

**Compliment: I don't, I don't believe in drugs, Your Honor.**

**The Court:—when dope is in the mix.**

**Compliment: I never have.**

**The Court: That's good.**

**Compliment: Sit or stand?**

**The Court: I wish all of us could say that. *Right, Ms. Orta*?**

**Compliment: I don't like drugs.**

**The Court: (Laughing.)**

(Tr. at 3-4)(emphasis added).

{¶5} During the sentencing component of Compliment's hearing, the trial judge asked Compliment about his employment. Compliment responded that he had worked at Ameriwood Industries for two years.  The judge then asked:

> **The Court: You know what we call Ameriwood, right?**
>
> **Compliment: Amerigod.  I don't want to know.**
>
> **The Court: Well, I think you probably know what they call it, right?**
>
> **Compliment:  Well, we call it along of things.**
>
> **The Court: Ameriweed.**

(Tr. at p. 6).

{¶6} The trial judge continued to address Compliment about his pending legal matters in open court.

> **The Court: What are you doing about your other charges?**
>
> **Compliment: I've just been waiting to—I've got to, I got to go talk to my lawyer on the 20th, Your Honor.**
>
> **The Court: Well, if I, if I follow their (the prosecution's) recommendation, you're not going to be out to fucking see him on the 20th.**

(Tr. at 7).

{¶7} Following the pronouncement of Compliment's sentence and before moving to the next case involving another defendant, the trial judge made another impromptu reference to Orta while she sat in the courtroom:

> **The Court:** *Oh, before we get started, I think Ms. Orta's under the influence. I want her drug tested.*
>
> **Prosecutor: Yes, Your Honor.**
>
> **Voice 1: We were on the record.**

(Tr. at 10)(emphasis added).

{¶8} Adhering to the trial judge's instruction, the record indicates that the court bailiff escorted Orta out of the courtroom, ostensibly to administer a drug test. Eventually, the cases involving Trevor Danner, Orta's personal acquaintance, were called to order. The following exchange occurred on the record upon Danner appearing before the court.

> **The Court: Hold it. Hold it. Who's that vision? That vision of a man I haven't seen in so long? Ho, just getting by, doing his own thing. Trev Danner. Holy Smokes. How you doing, Trev? How you been?**
>
> **Danner: You know, not too bad. Just going to work, coming home, going to work, coming home and slipped up and got caught, you know.**
>
> **The Court: Slipped up and got caught. Yeah, baby. Slipped up and got caught.**

(Tr. at 10-11).

{¶9} The trial judge proceeded to recite the charges against Danner in three cases, which included driving under a 12 point license suspension, driving under suspension, and using fictitious tags. Danner indicated that he wanted to plead no contest to the charges. The trial judge engaged in a plea colloquy with him, found

the plea knowingly, voluntarily and intelligently made, and accepted the plea. The

trial judge then further addressed Danner.

> **The Court: You're, you're an institutional kind of guy, right?
> Hey, is it true? I heard that you overdosed a couple weeks ago.**
>
> **Danner: No. I didn't, I didn't personally overdose.**
>
> **The Court: Oh, was it, was it—**
>
> **Danner: (Inaudible)**
>
> **The Court:—*Alexzandria (Orta) that overdosed?* Somebody did.**
>
> **Danner: I mean, I'm, I wouldn't want to make you mad or
> angry, but—**
>
> **The Court: Hey, Trev, Trev—**
>
> **Danner: (Inaudible)**
>
> **The Court: —listen to me. I know that you've been doping all
> along. You ran, and what do you think I'm going to do? I know
> that you've been playing cat and mouse with the cops for
> months.**
>
> **Danner: Well—**
>
> **The Court: For almost a year. Now, the chicken's come home to
> roost, my friend.**

(Tr. at 16)(emphasis added).

{¶10} The trial court proceeded with the hearing on Danner's cases. The

trial judge read the police report aloud, which described the details of law

enforcement's traffic stop of Danner's vehicle to execute active warrants for his

arrest. The police report indicated that Orta was present in the vehicle at the time of the traffic stop. The trial judge questioned Danner about Orta's involvement in the matter. Notably, Orta was not a party to the cases; nor does the record indicate that she had been formally charged or accused of any wrongdoing as a result of the incident discussed in open court.

> **The Court: (reading from the police report)... I made contact with Trevor and arrested him on his active warrants. We also, verifying his information, I learned that he had a suspended license. *Located in the vehicle was Alexzandria Orta and two small children.***

(Tr. at 17) (emphasis added).

{¶11} At that point, the trial judge stopped reading the police report and remarked.

> **The Court: *Wow. Ms. Orta's down here. She's probably going to go to jail too.* Who's watching the kids? Trev?**
>
> **Danner: Dad.**
>
> **The Court: Who's—**
>
> **Danner: Probably my dad. Like, my father.**
>
> **The Court: (Laughing). Your dad. I heard your dad went to jail for you, too; is that right?**
>
> **Danner: I, I don't, I'm not for sure.**
>
> **The Court: Yes, he did.**
>
> **Danner: I, I don't, I don't really talk to dad that much when I was out, you know.**

**The Court:  Wow.**

(Tr. at 17-18) (emphasis added).

{¶12} The trial court proceeded to the sentencing phase in Danner's cases.

The prosecution stated its recommendation on the record.

**The Court: What do I do, Trev?**

**Danner: I don't know.  I just want to apologize, you know.  I apologized to (inaudible)—**

**The Court:  Oh, Trev.  Trev.  It sounds really hollow right now.  No offense.**

**Danner: If they have possible (inaudible)—**

**The Court:  It sounds like you're just trying to get out of something.**

**Danner:  I mean, I've got to man up to it.  I'm here, ain't I.**

**The Court:  Yep.**

**Danner:  I mean, there ain't nothing—**

**The Court:  Hey, Trev, you're only here because they hunted you down like a dog.**

**Danner:  Well—**

**The Court:  No offense.**

**Danner:  —I mean—**

**The Court:  I mean, that's the truth, isn't it?**

**Danner:  (inaudible)**

**The Court: You had no intentions of ever turning yourself in.**

**Danner: I mean, I don't, I ran for a year, I mean, and they, and it's not like, I mean, I just did my regular routine every day and got up and went to work. Got up and went to work. I mean, I never came to Tiffin. I never drove around. I never hardly did anything. Like that, that's, I don't, I don't—**

**The Court: Except you were coming in to get some dope.**

**Danner: No.**

**The Court: Trev, I don't know, you don't do so good on probation. Why don't I just give you six months and wash my hands of you? What do you say? Do you really want to be on probation with me?**

**Danner: I mean, yeah—no, not really, but—**

**The Court: Hundred and eighty days. Hundred and eighty days. Thirty days. Concurrent, not consecutive. And trust me, I think there's more coming.**

(Tr. at 19-21).

{¶13} The record then indicates that an unidentified person in the courtroom brought to the trial court's attention that other prior violations, seemingly probation violations, also needed to be resolved by the court at that time. The individual recommended 150 days of jail time for the violations.

**The Court: Uh, what do you think, Trev? Am I giving two for one today? I don't think so. I hate to saddle the Seneca County Jail with you, but, Trevor, you've been so, you know, defiant about this and haven't followed through with a thing. I'm trying to help you out. I know you overdosed since then. I'm giving you the 150 days. That's consecutive—**

-9-

**Danner:  I did not.**

**The Court:—not concurrent.  Good luck.**

(Tr. at 22).

{¶14} After the conclusion of Danner's cases, the trial court recessed for lunch.  Upon returning from lunch, Orta was brought before the trial judge and the following transpired:

**The Court: Ms. Orta? Did we get our sample?**

**Orta: No.**

**The Court: Why not?**

**Orta : Because I didn't want to take it.**

**The Court: Pardon?**

**Orta: I didn't want to take it.**

**The Court: Why didn't you want to take it?**

**Orta: Because I don't see how I'm in trouble.**

**The Court: Okay. Well, you come into my courtroom, I think
you're high, you're in trouble.**

**Orta: Okay. I'm not, though.**

**The Court: Well, then take the test. You want to take the test or
no?**

**Orta: No.**

> **The Court: I have a journal entry?  We're going to hold you in contempt.  I'm going to submit and commit you for ten days. When you decide you want to take a test, then I'll, then we'll talk about this again. All right?**
>
> **Orta: Okay.**
>
> **The Court: Is there anything else? Remand to custody. You have the keys, Ms. Orta.**

(Tr. at  23-24).

{¶15} The trial judge then issued a form Judgment Entry with a handwritten order stating that:

> **In addition, the Court finds Alexandria (sic) Orta in direct contempt—defendant committed for 10 days to the Seneca County Jail or until she should submit a urine sample.**

 (Doc. No. 11).

{¶16} The record reflects that Orta was immediately remanded to the custody of the Seneca County Sheriff and incarcerated in the Seneca County Jail.

{¶17} On March 12, 2020, the next day at approximately 9:06 a.m., counsel for Orta filed a Notice of Appeal and a Motion for Stay of Execution of Sentence Pending Appeal.  In this motion, counsel explained that Orta is a single mother of two young children, has no criminal record or substantial traffic record, and is not a flight risk.  Accordingly, counsel requested Orta be released from custody pending the appeal.  It appears that the trial judge handwrote on the bottom of the motion,

"Set for hearing. ME Repp 3/12/20." (Doc. No. 4). The docket reflects that a hearing was scheduled for 12:45 p.m. the same day.

{¶18} Later that day, at approximately 1:08 p.m., the trial judge issued a journal entry with the handwritten portion of the entry indicating "case dismissed— journal entry to follow." (Doc. No. 11). In a subsequent judgment entry, the trial judge ordered the case to be dismissed, indicating that following a discussion with the parties in chambers the State moved to dismiss the case. However, it should be noted that this dismissal is null and void because it was filed after the Notice of Appeal of the judgment finding Orta in contempt of court, which is the subject of this appeal.[2]

{¶19} On appeal, Orta asserts the following assignment of error

**THE TRIAL COURT DENIED APPELLANT HER DUE PROCESS RIGHTS AND ABUSED ITS DISCRETION IN FINDING APPELLANT IN CONTEMPT AND ORDERING HER CONFINED IN THE SENECA COUNTY JAIL.**

*Civil v. Direct Contempt*

{¶20} Contempt proceedings are typically classified as civil or criminal, based on the purpose of the sanctions imposed. *State v. Kilbane*, 61 Ohio St.2d 201, 205 (1980). If the sanctions are intended to coerce the contemnor to comply with

---

[2] "Once a case has been appealed, the trial court loses jurisdiction except to take action in aid of the appeal. The trial court retains jurisdiction over issues not inconsistent with the appellate court's jurisdiction to reverse, modify, or affirm the judgment appealed from." *In re S.J.*, 106 Ohio St.3d 11, 2005-Ohio-3215, ¶ 9, citing *State ex rel. Special Prosecutors v. Judges, Court of Common Pleas* (1978), 55 Ohio St.2d 94, 97.

lawful orders of the court, the contempt proceeding is civil. *Id*. at 204-205. On the other hand, if the punishment is punitive in nature and is designed to vindicate the court's authority, the contempt proceeding is criminal. *Id*. "[C]ivil contempts are characterized as violations against the party for whose benefit the order was made, whereas criminal contempts are most often described as offenses against the dignity or process of the court." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 555 (2001).

*Indirect v. Direct Contempt*

{¶21} Courts distinguish not only between civil and criminal contempt, but also between indirect and direct contempt. Indirect contempt occurs outside the presence of the court. *In re Lands*, 146 Ohio St. 589, 595 (1946). Direct contempt occurs in the presence of the court and has been defined to include "conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 15 (1988), quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55, 56 (1971). "Courts, in their sound discretion, have the power to determine the kind and character of conduct which constitutes direct contempt of court." *Kilbane* at paragraph one of the syllabus.

*Discussion*

{¶22} The Supreme Court of Ohio has defined "contempt of court" as the disobedience of a court's order. *See Denovcheck*, 36 Ohio St.3d at 15 (1988). More

specifically, "[i]t is conduct which brings the administration of justice into disrespect or which tends to embarrass, impede, or obstruct a court in the performance of its functions." *Id*. The court's power to punish contumacious conduct is both inherent and statutory. *Id*.; R.C. 2705.01 and 2705.02. As a general rule, a trial court has the inherent authority to manage its own proceedings and control its own docket. *See Love Properties, Inc. v. Kyles*, 5th Dist. Stark No. 2006CA00101, 2007-Ohio-1966, ¶ 37, citing *State ex rel. Nat. City Bank v. Maloney*, 7th Dist. Mahoning No. 03 MA 139, 2003-Ohio-7010, ¶ 5.

{¶23} Direct contempt is defined in R.C. 2705.01 as "misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice." R.C. 2705.01; *Kilbane* at 204. It has been said that R.C. 2705.01 "merely restates the inherent power of a court to summarily punish contemptuous acts committed in the presence of the court." *In re Carroll*, 28 Ohio App.3d 6, 8 (8th Dist.1985), fn. 5.

{¶24} Under R.C. 2705.01, a court may summarily punish a person for direct contempt on two conditions: first, the judge must have personal knowledge of the disruptive conduct "acquired by his own observation of the contemptuous conduct." *In re Oliver*, 333 U.S. 257, 275 (1948); R.C. 2705.01. Second, the conduct must pose "an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public" that, if "not

instantly suppressed and punished, demoralization of the court's authority will follow." *Oliver* at 275; R.C. 2705.01; *In re Thomas*, 1st Dist. No. C-030429, 2004-Ohio-373. Direct contempt of court occurs in a way so closely related to the court itself that a finding may occur summarily, and the court is not required to provide the contemnor with a hearing. *In re Purola*, 73 Ohio App.3d 306 (3d Dist.1991).

{¶25} It is apparent from the basic principles of contempt law that a court may punish a person for direct contempt who has threatened or disrupted court proceedings, even if the person did not specifically disobey any particular order issued before or during the proceeding. Therefore, if a spectator's conduct in the courtroom is disruptive or openly threatens the orderly procedure of the court, the trial court is empowered under its inherent and statutory authority in R.C. 2705.01 to order a person arrested for direct contempt of court. *See State v. Johnson*, 34 Ohio App. 3d 373 (1st Dist. 1987)(finding it permissible under this authority for the court to arrest a disruptive spectator for contempt of court and noting that a weapon discovered in a search incident to such an arrest may be lawfully seized and used as evidence in a subsequent criminal prosecution).

{¶26} Notably, in the case *sub judice*, there is nothing in the record to suggest that Orta's conduct in the courtroom constituted contemptuous action to invoke the trial judge's exercise of his authority under R.C. 2705.01. The record indicates that the trial judge apparently concurred with this conclusion given that he failed to detail

any specific facts or findings, either on the record or in his judgment entry finding

Orta in contempt, of any contemptuous conduct punishable under R.C. 2705.01.

**{¶27}** Rather, the trial judge specifically stated in its March 11, 2020

Judgment Entry that he found Orta guilty of "direct" contempt of court in violation

of R.C. 2705.02(A), which states:

> **A person guilty of any of the following acts may be punished as for a contempt:**
>
> **(A) Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or officer;**
>
> **\* \* \***

**{¶28}** Thus, the record reflects that the trial judge found Orta in direct

contempt for violating his oral in-court command that she immediately submit to a

urine test. Accordingly, we must examine whether the trial judge had the authority

to command a courtroom spectator to submit to a drug test in order to determine

whether the judge's finding of direct contempt in this case was a valid exercise of

his authority under R.C. 2905.02(A). In this instance, the trial judge failed to cite

any particular legal basis for its authority to order the administration of the urine

test other than his summary conclusion, "I think Ms. Orta's under the influence. I

want her drug tested." (Tr. at 10).

**{¶29}** As previously noted, the record is devoid of any specific observations

or findings by the trial judge of Orta's conduct in the courtroom supporting his stated

belief that she was under the influence while observing the court proceedings. Moreover, on such a record, neither the trial court nor the State has presented any recognized authority permitting a trial judge to *sua sponte* order a drug test to be immediately administered to a spectator in the courtroom, let alone some procedural or statutory justification for ordering the drug test.[3]  On the contrary, *see State v. Stafford*, 7th Dist. Columbiana No. 12 Co 24, 2013-Ohio-4356 (reversing a trial court's finding of contempt based upon the results of a drug test that the trial court *sua sponte* ordered the defendant to take during a pre-trial hearing based upon its suspicions that the defendant was intoxicated and noting the apparent lack of any authority to order administration of the test).  Therefore, we conclude that under the specific facts and record before us in this case, the trial judge was without the authority to compel Orta to submit to a drug test.  Hence, his command compelling her to submit to a drug test was improper.  Accordingly, we conclude that the trial judge's finding of Orta in direct contempt of court was without cause and constituted an invalid exercise of his contempt power under R.C. 2705.02(A).

{¶30} In conclusion, while we are mindful that a trial court has the inherent authority to manage its own proceedings and control its own docket, this authority must be exercised within bounds of due process.  In this regard, we would further

---

[3] It should be noted that the State concedes in is brief that "under analysis using any version of contempt that [Orta] could not be compelled to submit a urine sample to test her for drug consumption for the mere privilege of attending open court."  (Appe. Brief at 6).

note and caution that in circumstances strikingly similar to those before us in this case, a trial judge was admonished and sanctioned for abusing his power of contempt by jailing a spectator in the gallery of his courtroom without cause. *See Disciplinary Counsel v. Parker*, 116 Ohio St.3d 34, 2007-Ohio-5635, ¶ 9. *Accord O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, ¶ 33-40; *Disciplinary Counsel v. Cox*, 113 Ohio St.3d 48, 2007-Ohio-979, ¶ 41.

{**¶31**} For all these reasons, the first assignment of error is sustained and the judgment of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**